**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| County of Maricopa, | No. CV-14-01372-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Office Depot Incorporated, | |
| Defendant. | |

## INTRODUCTION

Pending before the Court are seven motions in limine (Docs. 155, 156, 157, 158, 159, 160, 161), two motions to exclude expert opinions (Docs. 171, 172), supplemental briefs regarding whether Maricopa County is entitled to a jury trial (Docs. 193, 195, 196), and supplemental briefs concerning the applicability of the Uniform Commercial Code ("UCC") (Docs. 198, 199). The Court circulated its tentative ruling on these matters on October 3, 2019 (Doc. 200), held oral argument on October 4, 2019, and hereby rules as follows.

## PROCEDURAL HISTORY

Maricopa County brought this action on May 1, 2014 in Maricopa County Superior Court. (Doc. 1-1 at 4-19.) It was removed to this Court on June 19, 2014. (Doc. 1.)[1] The complaint alleged two contract-related claims (breach of contract and breach of the implied covenant of good faith and fair dealing) and claims for negligent misrepresentation,

---

[1] This case was reassigned to the undersigned judge on April 30, 2019. (Doc. 145.)

common law fraud, and violation of the Arizona Consumer Fraud Act ("ACFA"). (*Id.* at 15-19.) Essentially, Maricopa County alleged that a "bundle of interrelated documents and contractual agreements" between various parties comprised a contract that Maricopa County was "free to enforce . . . against Office Depot." (*Id.* at 12 ¶ 39.) This "bundle" included a 2006 Master Agreement between Los Angeles County and Office Depot, as well as various provisions included in or incorporated into Los Angeles County's Request for Proposal ("RFP"). (*Id.* at 8 ¶ 20, 9-11 ¶¶ 26-33.) It also included an Administration Agreement between U.S. Communities and Office Depot. (*Id.* at 8 ¶ 21.) The complaint alleged that the "contract terms and representations by Office Depot" led Maricopa County to "reasonably believe[] that under the 2006 Master Agreement Office Depot did in fact guarantee, and did provide, its best government pricing, without qualification." (*Id.* at 11 ¶ 36.) Yet, the complaint alleged, "[w]hile the 2001 and 2006 Master Agreements were in effect, Office Depot chose to violate its low price guarantee and sold office supplies to other governmental entities at prices materially lower than those offered to [Maricopa County] under the 2006 Master Agreement." (*Id.* at 12 ¶ 42.)

In June 2014, Office Depot moved to dismiss the complaint. (Doc. 10.) This motion was granted in part and denied in part. (Doc. 24.) The Court dismissed with prejudice the negligent misrepresentation, common law fraud, and ACFA claims because they were not pleaded with sufficient particularity and failed as a matter of law. (*Id.* at 17-19.) The Court also limited the contract-based claims. First, the Court found that Maricopa County did not have a direct contractual relationship with Office Depot. (*Id.* at 11 ["Although plaintiff alleges that it had a direct contractual relationship with defendant, plaintiff has not cited to any contract to which both it and defendant were parties. Plaintiff is not a party to the Master Agreement and plaintiff was not a party to any of the other agreements attached to the RFP or defendant's response to the RFP."].) The Court further found that Maricopa County failed to allege it was an intended beneficiary of the Master Agreement and thus dismissed the contract-based claims premised on an alleged breach of the Master Agreement. (*Id.* at 13-14.) However, the Court found that Maricopa County was a third-

party beneficiary of the Administration Agreement and therefore could proceed on the contract-based claims premised on an alleged breach of the Pricing Commitment in the Administration Agreement. (*Id.* at 15-16.)

Maricopa County moved for reconsideration as to its ACFA claim and as to the ruling that Maricopa County had no direct contractual relationship with Office Depot. (Doc. 26.) This motion was denied. (Doc. 27.)

In June 2016, the parties cross-moved for summary judgment on the contract-based claims. (Docs. 90, 91.) The Court granted summary judgment to Office Depot, accepting Office Depot's interpretation of the Pricing Commitment and finding there was no breach under that interpretation. (Doc. 105.) Office Depot had also moved for partial summary judgment under the theory that most of Maricopa County's alleged damages fell outside the statute of limitations (Doc. 91 at 16-17), but the Court declined to address this argument in light of the determination that Office Depot was entitled to summary judgment on other grounds.

Maricopa County appealed. (Doc. 109.) The Ninth Circuit upheld the dismissal of the negligent misrepresentation, fraud, and ACFA claims and the contract claims based on the Master Agreement. (Doc. 136-1 at 4-5.) The Ninth Circuit reversed only with respect to the summary judgment ruling, finding that "material disputes of fact" remain as to the proper interpretation of the Pricing Commitment. (*Id.* at 6-7.)

Accordingly, the only remaining claims following remand by the Ninth Circuit are the two contract-based claims (breach of contract and breach of the implied covenant of good faith and fair dealing) arising from the Pricing Commitment in the Administration Agreement.

Some additional background regarding the disputed issues in the case will be helpful for understanding the motions. The Pricing Commitment is one of three Commitments set forth in the Supplier Commitments, a single-page document incorporated by reference in the Administration Agreement between Office Depot and U.S. Communities. (Doc. 193-1 at 2 § 8 [incorporation provision]; *id.* at 6 [Supplier Commitments].) The Pricing

Commitment provides:

> A commitment that supplier's U.S. Communities pricing is the lowest available pricing (net to buyer) to state and local public agencies nationwide and a further commitment that, if a state or local public agency is otherwise eligible for lower pricing through a federal, state, regional or local contract, the supplier will match the pricing under U.S. Communities.

(*Id.* at 6.)

The parties dispute the meaning of the Pricing Commitment. Maricopa County contends the Pricing Commitment "require[d] [Office Depot's] U.S. Communities pricing to be . . . the lowest available pricing (net to buyer) to state and local public agencies nationwide, and that if [Office Depot] offered lower pricing to public agencies outside of U.S. Communities then that lower pricing bec[ame] [Office Depot's] U.S. Communities price." (Doc. 186 at 11.) On the other hand, Office Depot contends the Pricing Commitment simply required it to offer its lowest available pricing to the subset of state and local public agencies who were members of U.S. Communities, "such that, if a U.S. Communities member was 'otherwise eligible' for lower pricing, Office Depot would offer that member that lower pricing under the aegis of U.S. Communities." (Doc. 199 at 2. *See also* Doc. 186 at 11-12 ["The second clause of the Pricing Commitment . . . sets out how to address those occasional instances when an Office Depot contract potentially had lower pricing: if, based on the agency's usage, it would save money purchasing under a different contract held by Office Depot that the agency was eligible to use, Office Depot would treat that pricing as U.S. Communities' pricing."].)

There is one final wrinkle to Maricopa County's theory of liability in this case. To establish a breach of the Pricing Commitment under its interpretation of that provision, Maricopa County is relying on a contract between the City and County of San Francisco ("CCSF") and Office Depot. Notably, Maricopa County isn't arguing it should have been charged the same prices that CCSF *actually* paid under that contract. Instead, Maricopa County's theory is that it was entitled to the prices Office Depot *should have* been charging CCSF under the other contract (even though CCSF was actually charged and paid higher prices).

**ANALYSIS**

I.     <u>Jury Trial</u>

At the Final Pretrial Conference on July 24, 2019, the Court ordered the parties to provide supplemental briefing regarding whether Maricopa County is entitled to a jury trial. (Docs. 191, 192.)  Having reviewed those briefs (Docs. 193, 195, 196), the Court finds that Maricopa County is entitled to a jury trial.

     A.     **Parties' Arguments**

Below the three Commitments on the Supplier Commitments document is the following provision:

> The Corporate, Pricing and Sales Commitments are the foundation of the relationship between U.S. Communities and its suppliers. The Commitments are not negotiable.  If a supplier is found to be in violation and/or non-compliance with one or more of the U.S. Communities Commitments, the supplier will have ninety days to provide resolution and come into compliance.   Failure to do so will result in removal from the U.S. Communities national program.

(Doc. 193-1 at 6.)

Office Depot argues "[t]he language of the Supplier Commitments demonstrates that when U.S. Communities drafted those commitments, it contemplated a single, mandatory remedy for breach: violation 'will result in removal.'"  Office Depot further contends that, "[u]nder California law, the use of mandatory language, such as 'shall' or 'will' creates an exclusive remedy." (Doc. 193 at 5.) Office Depot continues that, although "[r]emoval from the U.S. Communities program at this late date is impossible, as Office Depot's relationship with U.S. Communities already ended nearly nine years ago," "Maricopa can seek specific performance here, as California law authorizes third-party beneficiaries to enforce a contract, including through specific performance."  (*Id.* at 6-7.) Because specific performance is an equitable remedy, Office Depot contends Maricopa County "has no right to a jury trial for its remaining claims." (*Id.* at 7.)

In response, Maricopa County argues "[t]he mere inclusion of remedial provisions in an agreement . . . does not of itself serve to limit the parties' remedies – to do so, the contract language must expressly recite that the contractually-provided remedies are

intended to be exclusive." (Doc. 195 at 3, emphasis omitted.)  Maricopa County concedes that "the contract language cited by Office Depot does provide for removal of a vendor from the program" but contends that "it nowhere recites that this is the sole and exclusive remedy available under the contract." (*Id.* at 4.)  Accordingly, Maricopa County argues the contract "does not preclude a damages claim against a vendor." (*Id.*)  Maricopa County also contends that other documents incorporated into the contract demonstrate that "[r]ather than making removal from the program the exclusive remedy, the U.S. Communities program contemplated that [Participating Public Agencies] would have the ability to prosecute claims against program vendors." (*Id.* at 5-6.)

B.    **Discussion**

"Parties have a right to a jury trial in lawsuits seeking legal remedies," but not in those seeking only equitable remedies. *U.S. Sec. & Exch. Comm'n v. Jensen*, 835 F.3d 1100, 1106 (9th Cir. 2016); *Teutscher v. Woodson*, 835 F.3d 936, 943 (9th Cir. 2016) ("The Seventh Amendment . . . secures the right to a jury trial for 'suits in which legal rights [are] to be ascertained and determined, in contradistinction to those where equitable rights alone [are] recognized, and equitable remedies [are] administered.'") (citations omitted).  Thus, if the Court were to agree with Office Depot that Maricopa County is entitled only to specific performance, Maricopa County would not be entitled to a jury trial.

Under California law, a contract may limit available remedies by expressly indicating that the contractually-provided remedies are exclusive. *See, e.g, Nelson v. Spence*, 6 Cal. Rptr. 312, 315 (Cal. App. Ct. 1960) ("Where a contract expressly provides a remedy for a breach thereof, the language used in the contract must clearly indicate an intent to make the remedy exclusive."); *McDonald v. Stockton Met. Transit Dist.*, 111 Cal. Rptr. 637, 642 (Cal. Ct. App. 1973) ("When a contract describes a remedy for breach without an express or implied limitation making that remedy exclusive, the injured party may seek any other remedy provided by law."); *Herbalife Int'l of Am., Inc. v. Ford*, 2007 WL 9757630, *12 (C.D. Cal. 2007) ("[A] remedy provided for in a contract is not exclusive unless it contains language expressly indicating exclusivity of the remedy.").  The Pricing

Commitment indicates only that a breach of any of the Supplier Commitments "will result in [Office Depot's] removal from the U.S. Communities national program." (Doc. 193-1 at 6.) It doesn't go further and affirmatively identify any remedies (such as lawsuits for damages) that are verboten. Thus, the Pricing Commitment cannot be fairly read to indicate that U.S. Communities (and third-party beneficiaries) are limited to the remedy of removing Office Depot from U.S. Communities in the event of a breach.

Office Depot argues that "[u]nder California law, the use of mandatory language, such as 'shall' or 'will' creates an exclusive remedy," and therefore, because the Pricing Commitment used the term "will," the Pricing Commitment "prescribed the mandatory remedy for a breach of any of the Supplier Commitments." (Doc. 193 at 5.) This argument is unavailing. The cases cited by Office Depot involved provisions stating that a contracting party "shall not" pursue a particular remedy or course of conduct in the event of a breach. For example, in *B. C. Richter Contracting Co. v. Continental Casualty Co.*, 41 Cal. Rptr. 98 (Cal. Ct. App. 1964), the provision at issue was: "Subcontractor, in the event of any dispute or controversy with Contractor or any other subcontractor over any matter whatsoever, *shall not* cause any delay or cessation in or of Subcontractor's work or the work of any other subcontractor or of the Contractor but shall proceed under this Subcontract Agreement with the performance of the work required thereby." *Id.* at 104 (emphasis added). The court held that "[t]he quoted clause bound [the subcontractor] to finish its work regardless of any dispute with [the contractor]" and "[i]n effect, the clause was an advance waiver of any right to rescind after partial performance." *Id.* Thus, "[t]he net result of the clause was to make a breach of contract action the subcontractor's exclusive remedy." *Id.* Similarly, at issue in *United Iron Works v. Standard Brass Casting Co.*, 277 P. 183 (Cal. Ct. App. 1929), was the following provision: "All defective castings will be replaced and foundry *shall not* be responsible for any extra machine work or contingent damages caused by reason of defective castings." *Id.* at 184 (emphasis added). The court found that the purchaser did not have the "right . . . to retain the goods and claim damages" because "the contract provide[d] that the remedy shall be the rejection and return

of the defective articles." *Id.* at 185. And the court in *Haskell Corp. v. ConocoPhillips Co.*, 2012 WL 845398 (Cal. Ct. App. 2012), an unpublished California Court of Appeal case, found that a clause providing that "CONTRACTOR *shall not* be entitled to claim nor shall OWNER be liable to CONTRACTOR or its lower-tier suppliers or subcontractors in tort (including negligence), or contract except as specifically provided in this contract" was "mandatory, rather than permissive, clearly conveying its intent that contract—not tort— is the exclusive remedy." *Id.* at *16 n.14 (emphasis added). "Shall not" was used in these cases as an express indication that the contractually-provided remedies were intended to be exclusive. But "shall not" does not appear in the contractual language at issue here and there is no similar limiting language used. Thus, although the language used in the Supplier Commitments is "mandatory" in the sense that Office Depot "will" be removed for noncompliance, it does not (unlike the language at issue in the cases cited by Office Depot) prohibit U.S. Communities, or third-party beneficiaries, from taking any particular action.

Office Depot also cites *Security Life Insurance Co. of America v. Meyling*, 146 F.3d 1184 (9th Cir. 1998), but it is unclear why Office Depot believes *Meyling* supports its position. In that case, an insurance company attempted to rescind a health insurance policy after learning its insured (Meyling) had failed to disclose, in his application, that he suffered from a host of serious ailments and conditions. *Id.* The policy itself included a provision stating that, "when misrepresentations [concerning the insured's health] are discovered . . . [t]here will be a charge to the policyholder or refund from the Insurer to adjust for past premium payments." *Id.* The Ninth Circuit began its analysis by noting that the insurance company's "ability to rescind its insurance agreement will depend entirely on federal common law." *Id.* at 1190. The court next observed—in a portion of the opinion entitled "Federal Common Law And Rescission"— that, because the policy language used the word "will," "the policy language is mandatory, not permissive. The policy does not provide for [the insurance company] to decide whether it will charge back or sue for rescission. The premium adjustment is automatically made without action on its part." *Id.* at 1192. However, the court then went on to note that "[t]his, of course, is not to say that

[the insurance company] forfeited its right to seek common law rescission." *Id.*

*Meyling*, in short, is an opinion holding that, as a matter of federal common law, a contractual provision stating that a contracting party "will" receive a particular remedy when a counterparty commits misconduct does not necessarily mean the aggrieved party has forfeited its right to seek other remedies. This is exactly the position Maricopa County takes here. Moreover, *Meyling* wasn't purporting to interpret California law.

In sum, the Court agrees with Office Depot that Maricopa County "cannot seek a remedy . . . that is not available to U.S. Communities." (Doc. 193 at 7.) However, because Office Depot has not shown that damages are unavailable to U.S. Communities, Maricopa County may seek damages here and is therefore entitled to a jury trial.[2]

## II.     Motions in Limine

### A.     **Maricopa County's motion re: notice of breach (Doc. 155)**

Maricopa County moves to preclude Office Depot from arguing at trial that Maricopa County failed to provide timely notice of its claims under the UCC.[3] (Doc. 155 at 2-3.) According to Maricopa County, any such argument would be mistaken because "[t]here is no question that Maricopa County made multiple demands upon Office Depot for the specific claims at issue in the instant lawsuit, and there is no question that Office Depot was made aware of Maricopa County's claims pertaining to violations of the low price guaranty and other contractually unauthorized overcharges." (*Id.* at 2.)

Office Depot responds that "Maricopa's years-long delay in providing notice was unreasonable as a matter of law" and "Maricopa's failure to provide timely notice precludes it from belatedly seeking to challenge the CCSF Contract pricing." (Doc. 162 at 1-3.)

Because the motion concerns the notice requirements under the UCC, the Court first must determine whether the UCC applies here. On September 23, 2019, after noticing

---

[2]     This is the same conclusion that was set forth in the Court's tentative ruling, and Office Depot declined to provide further argument on this issue during the hearing.

[3]     Maricopa County never explicitly makes this request in its motion, but the proposed order Maricopa County emailed to the Court clarifies that Maricopa County is seeking an order holding that "the parties need not and shall not present evidence that Maricopa County made prelitigation demand on Office Depot."

some disagreement between the parties and internal inconsistency in the parties' own briefs on the issue of the applicability of the UCC, the Court sought supplemental briefing from the parties regarding the following two issues: (1) whether the UCC applies to Maricopa County's claims; and (2) whether any arguments in the pending motions in limine should be disregarded because they are premised on a misunderstanding of the UCC's (in)applicability. (Doc. 197.)

In its supplemental brief, Maricopa County did not directly address these questions. Instead, it focused its argument on why the statute of limitations should be governed by Arizona law. (Doc. 198.) Nevertheless, Maricopa County's supplemental brief does contain a statement that the Administrative Agreement is a contract for services to which general contract law, not the UCC, applies. (*Id.* at 5.)

In its supplemental brief, Office Depot contends that Maricopa County must prove two breaches to prevail on its claims—(1) breach of the CCSF contract and (2) breach of the Pricing Commitment incorporated into the Administration Agreement. (Doc. 199 at 2-3.) Office Depot further argues that, because the CCSF agreement is a contract for the sale of goods, to which the UCC applies, and the Administrative Agreement is a contract for services, to which general contract law applies, "to establish liability, Maricopa must satisfy the different requirements imposed by those regimes on each allegedly breached contract." (*Id.*) In its supplemental brief, Office Depot also clarifies that its "UCC notice" argument concerns the notice Maricopa County was purportedly required to provide of Office Depot's alleged breach of the CCSF contract, not of the Administration Agreement: "Under the UCC, in order to challenge Office Depot's interpretation of and performance under the CCSF Contract, Maricopa County must first show that it provided timely notice to Office Depot of its concerns regarding Office Depot's compliance with the terms of the CCSF Contract." (*Id.* at 3.)

As an initial matter, both parties agree the Administration Agreement is a contract for services to which general contract law, not the UCC, applies. As such, the UCC notice provision, UCC § 2-607 (adopted without change in California at Cal. Com. Code § 2607),

does not apply to Maricopa County's claim for breach of the Administration Agreement.

The Court rejects Office Depot's argument that Maricopa County was nevertheless required by Cal. Com. Code § 2607 to provide notice of the breach of the CCSF contract. The relevant language of that statute provides: "The *buyer* must, within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy." Cal. Com. Code § 2607(3)(A) (emphasis added). Maricopa County was not the "buyer" in the contract between CCSF and Office Depot, so the plain language of the statute suggests Maricopa County didn't have any notification duties. This is, admittedly, an unusual case because Maricopa County is attempting to use Office Depot's alleged breach of the CCSF contract as the foundation for its claim that a different contract (a services contract) was breached. But Office Depot has not identified any case holding that section 2607(3)(A)'s notice provision applies in this circumstance and the Court is unwilling to endorse an atextual interpretation of the statute in the absence of any controlling authority requiring such an interpretation.

For these reasons, Maricopa County's motion will be granted—Office Depot cannot argue at trial that Maricopa County failed to provide timely notice of its claims as required by Cal. Com. Code § 2607.[4]

B. **Maricopa County's motion to exclude standards/guidelines applicable to other U.S. Communities contracts (Doc. 156)**

Maricopa County moves to exclude from evidence "standards and guidelines applicable to contracts that U.S. Communities had with other parties." (Doc. 156 at 1.)[5] Maricopa County moves on three grounds: (1) consideration of these materials is barred by the parol evidence rule; (2) "U.S. Communities' issuance of Compliance Guidelines

---

[4] This is the same conclusion that was set forth in the Court's tentative ruling, and Office Depot declined to provide further argument on this issue during the hearing. Also, because Maricopa County's motion is being granted, the Court will deny, as moot, Maricopa County's alternative request for permission to amend its complaint to add a notice-related allegation. (Doc. 155 at 3.)

[5] Office Depot clarifies in its response that the documents to which Maricopa County is referring are "materials prepared by U.S. Communities and provided to lead agencies, including Maricopa, for inclusion in Requests for Proposals." (Doc. 163 at 1.)

relative to other RFPs and other contracts does not make it more probable that the parties intended to be bound by such additional terms as are not in the Administration Agreement"; and (3) "[i]f Office Depot is permitted to introduce into evidence thirteen unrelated contracts with similar but not wholly the same terms or permitted to refer in testimony or argument to terms from unrelated contracts, there will be a great danger of both confusing the issues and misleading the jury." (*Id.* at 2-3.)

Under California law, the parol evidence rule "prohibits the introduction of any extrinsic evidence to alter, vary, or add to the terms of an integrated written agreement." *Julius Castle Rest. Inc. v. Payne*, 157 Cal. Rptr. 3d 839, 850 (Cal. Ct. App. 2013). However, where the court determines that contractual language is reasonably susceptible to more than one interpretation, it may admit extrinsic evidence to determine the correct interpretation. *Wolf v. Superior Court*, 8 Cal. Rptr. 3d 649, 656 (Cal. Ct. App. 2004), *as modified on denial of reh'g* (2004). Here, the Court has already found that the Pricing Commitment is ambiguous and the Ninth Circuit upheld that finding. (Doc. 105 at 11; Doc. 136-1 at 6.) Thus, extrinsic evidence is admissible.

"Because '[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties,' the Court may consider extrinsic evidence of the parties' intent when the contract is ambiguous." *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 943 (C.D. Cal. 2011) (quoting *Morey v. Vannucci*, 75 Cal. Rptr. 2d 573, 578 (Cal. Ct. App. 1998)); *see also Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968) ("In this state . . . the intention of the parties as expressed in the contract is the source of contractual rights and duties. A court must ascertain and give effect to this intention by determining what the parties meant by the words they used.") (footnote omitted). "While a party may not testify to his undisclosed subjective intent in entering into an agreement, the [parol evidence] rule does not preclude admission of evidence of the surrounding circumstances, usage and custom in the industry, negotiations and discussion, or any other extrinsic evidence which may shed light on the mutual intention of the parties." *Pac. Gas & Elec. Co. v. Zuckerman*, 234 Cal. Rptr. 630,

648 (Cal. Ct. App. 1987).

Accordingly, to the extent Office Depot seeks to introduce the U.S. Communities guidelines associated with the Pricing Commitment in other contracts/RFPs in an attempt to shed light on the parties' intent at the time of entering into the contract, that evidence will not be excluded as irrelevant or barred by the parol evidence rule. It also bears emphasizing that the parties to the contract at issue here, the Administration Agreement, are U.S. Communities and Office Depot. Maricopa County was not a party—it is only a third-party beneficiary. Thus, the fact Maricopa County was not a party to any of the other contracts/RFPs is irrelevant to the analysis. Under California law, a contracting party's interpretation of other versions of a form contract may be relevant in determining that party's intent. *Heston v. Farmers Ins. Grp.*, 206 Cal. Rptr. 585, 592 (Cal. Ct. App. 1984) (defendant's interpretation of identical paragraph in separate agreement was admissible to show both parties "intended the Agreement to mean the same thing"). *Cf. S. Cal. Edison Co. v. Superior Court*, 44 Cal. Rptr. 2d 227, 234 (Cal. Ct. App. 1995), *as modified on denial of reh'g* (1995) ("The practical interpretation of the contract by one party, evidenced by his words or acts, can be used against him on behalf of the other party, even though that other party had no knowledge of those words or acts when they occurred and did not concur in them. In the litigation that has ensued, one who is maintaining the same interpretation that is evidenced by the other party's earlier words, and acts, can introduce them to support his contention.") (quoting 3 Corbin on Contracts (1960) § 558, p. 256).

Maricopa County also seeks exclusion because the "2005-2012 RFPs include substantially different terms relating to the Pricing Commitment which are nowhere to be found in the 2006 Los Angeles County contract or its incorporated documents." (Doc. 156 at 2.) However, Maricopa County has not presented any evidence in support of that contention and concedes in a different part of its motion that the thirteen other contracts included "similar" although "not wholly the same" terms. (*Id.*)

This clarification underscores why Maricopa County's Rule 403 argument is unavailing. Rule 403 requires that the probative value of the evidence be substantially

outweighed by a danger of confusing the issues or misleading the jury, and Maricopa County has provided nothing more than a conclusory statement that such a danger exists here. (Doc. 156 at 2.)

Accordingly, the Court denies the motion—Office Depot will not be categorically barred from introducing standards and guidelines applicable to other U.S. Communities contracts. However, this does not mean Maricopa County has forfeited its ability to make targeted objections during trial. For example, it's possible that the introduction of such evidence could, after a certain point, become cumulative. Additionally, there appears to be an unresolved disagreement between the parties, which they are encouraged to brief in their trial memoranda, concerning whether there are temporal limitations on the admissibility of such evidence (*i.e.,* whether standards and guidelines promulgated after the Administrative Agreement was signed could shed light on the parties' intent at the time of contract execution).

C. **Office Depot's motion to exclude evidence/argument re: claims or damages barred by the statute of limitations (Doc. 157)**

Office Depot moves to "exclud[e] all evidence and argument relating to claims or damages predating August 23, 2009." (Doc. 157 at 1.3.) In support of this argument, Office Depot asserts that Maricopa County can only prove a breach of the Pricing Agreement if Office Depot also breached the CCSF contract. (*Id.* at 2.) Therefore, according to Office Depot, the four-year statute of limitations began to run when the CCSF contract ended (*i.e.,* November 30, 2009). Office Depot further notes that the parties entered into a tolling agreement on August 23, 2013, so it contends that "Maricopa County's claims based on the Pricing Commitment—its only remaining claims—are barred except as . . . related to purchases made during the roughly three-month period of August 23 to November 30, 2009, when both the CCSF Contract and the Pricing Commitment were in effect." (*Id.* at 3.)

In response, Maricopa County argues: (1) "[a] motion in limine is an improper vehicle by which to seek summary judgment"; (2) "Office Depot is relitigating issues

already addressed by this Court"; (3) "[t]he contractual dispute between Maricopa County and Office Depot is governed by Arizona law"; (4) "[i]f not immune from the limitations defense, Maricopa's claims are otherwise governed by A.R.S. § 47-2725, subject to the discovery rule"; and (5) "[e]ven if California law applies," the discovery rule and equitable tolling apply. (Doc. 164.)

As discussed during the hearing, the statute-of-limitations issues in this case are complex (both procedurally and legally) and would profit from additional briefing. Accordingly, the Court will deny, without prejudice, Office Depot's motion in limine on this topic and will instead authorize Office Depot to file a motion for summary judgment limited to the issue of the statute of limitations. Office Depot's motion must be filed by October 23, 2019, Maricopa County's opposition must be filed by November 6, 2019, and Office Depot's reply must be filed by November 13, 2019.

The Court will further provide the following observations, which may help guide the parties' arguments. The issue of the applicable statute of limitations has been raised on several prior occasions in this case. In June 2014, Office Depot moved to dismiss Maricopa County's "contract-based claims" because they are "largely barred by the statute of limitations." (Doc. 10 at 4.) In support of this argument, Office Depot cited Arizona law. (*Id.*) The Court denied this motion because, under Arizona law, political subdivisions (such as Maricopa County) are "exempt from the statute of limitations." (Doc. 24 at 9-11, citing A.R.S. § 12-510.) Two years later, in June 2016, Office Depot moved for summary judgment on Maricopa County's contract-based claims under a statute-of-limitations theory. (Doc. 91 at 16-17.) This time, Office Depot argued that California law— specifically, Cal. Civ. Proc. Code § 337(1)—supplied the relevant statute of limitations and that California law doesn't recognize an exemption for political subdivisions. (*Id.*) Although the Court didn't directly address this argument in its order resolving the parties' cross-motions for summary judgment, the Court did reach the general conclusion that California law applies to the contract-based claims in this case because those claims are "based on allegations that [Office Depot] breached the Pricing Commitment in the

Administration Agreement" and "[t]he Administration Agreement plainly provides that California law applies to any disputes as to the interpretation of that agreement." (Doc. 105 at 5-8.) Finally, although the Ninth Circuit disagreed in part with the order on the cross-motions for summary judgment, the Ninth Circuit left undisturbed that order's discussion of the applicable state law.

Given this backdrop, the Court stated in its tentative ruling that the initial statute-of-limitations ruling in this case (*i.e.,* the ruling, in the order addressing Office Depot's motion to dismiss, that Arizona law governs the statute of limitations) may no longer be valid. The tentative ruling further noted that this development may be significant because California law (unlike Arizona law) does not exempt counties and other political subdivisions from the statute of limitations.[6] During oral argument, Maricopa County disagreed with these tentative conclusions and identified various reasons why, in its view, the Arizona exemption for political subdivisions should still apply here. The parties should make sure to address these issues in their briefs.

In the tentative order, the Court further concluded that, even if California law applies (and even if California law wouldn't recognize Arizona's exemption for political subdivisions), Maricopa County should still be able to present its full set of claims to the jury because (1) section 337(a) of the California Code of Civil Procedure (and not the UCC-based provisions of the California Commercial Code) provides the applicable statute of limitations of four years, (2) the discovery rule is therefore potentially applicable (because, although the California Commercial Code precludes the use of the discovery rule, the California Code of Civil Procedure does not), and (3) Maricopa County may be able to present a fact issue at trial concerning whether there was a valid delay in its discovery of

---

[6]     *See, e.g., City of Los Angeles v. Los Angeles Cty.*, 72 P.2d 138, 140 (Cal. 1937) ("[I]t is well settled generally that municipalities are subject to statutes limiting the time for commencement of actions."); *City of Fullerton v. Orange Cty.*, 35 P.2d 397, 399 (Cal. Dist. Ct. App. 1934) ("Local public corporations, such as municipalities, counties, and school districts, are amenable to the statute of limitations with regard to property or contract rights which the corporation claims for its own convenience as a corporation."); *People v. Chambers*, 233 P.2d 557, 561 (Cal. 1951) ("[G]eneral statutes of limitation apply against various agencies of the state or the state when its 'sovereign' rights are not involved.").

its claims. In response to the tentative ruling, Office Depot raised various reasons why the discovery rule should be deemed unavailable here (including, but not limited to, the argument that California law does not allow third-party beneficiaries to invoke the discovery rule). The parties should make sure to address these issues in their briefs, too.

### D. **Office Depot's motion to exclude evidence/argument re: San Francisco settlement and related audits (Doc. 158)**

The contract between CCSF and Office Depot was in effect from January 2005 to November 2009. After hearing about other entities conducting audits of their contracts with Office Depot, which subsequently resulted in settlements, CCSF conducted its own audit and found millions of dollars in overcharges. (Doc. 158-1 at 5-6; Doc. 158-2 at 2-3.) Ultimately, after corresponding regarding the audit results, CCSF and Office Depot settled for $4.25 million (with no admission of liability). (Doc. 158-2 at 5-10.)

After hearing about CCSF's and other entities' audits, Maricopa County conducted its own audit. (*Id.* at 23-24.) The Maricopa County audit "accepted the [CCSF] auditor's assessment of what pricing should have been under that contract." (*Id.* at 31.)

Office Depot moves to "exclude[e] all evidence and argument relating to the settlement between Office Depot and [CCSF], including settlement-focused audits by CCSF and Maricopa," on three grounds: (1) this evidence is barred by Rule 408; (2) the audits "are inadmissible hearsay not subject to any exception"; and (3) "[e]ven were this evidence otherwise admissible, it should be excluded given the substantial and unnecessary risk of unfair prejudice and jury confusion." (Doc. 158.)

#### 1. Rule 408

Rule 408(a) provides:

(a) Prohibited Uses. Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

(1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and

(2) conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related

to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

The Ninth Circuit has interpreted Rule 408(a) as prohibiting a party from introducing evidence of a settlement in an unrelated case in which it was not a party. *Hudspeth v. Comm'r*, 914 F.2d 1207, 1213 (9th Cir. 1990) ("The Taxpayers contend that Rule 408 is inapplicable to the present case because they were not parties to the Pine Products settlement and the claims involved in the present case are not the same claims that were involved in the Pine Products case. The Taxpayers' contention that Rule 408 does not apply when third party compromises are involved is not tenable. Rule 408 does apply to situations where the party seeking to introduce evidence of a compromise was not involved in the original compromise.").[7] Thus, evidence of the CCSF settlement and related settlement discussions is inadmissible to prove the validity or amount of Maricopa County's claims.

Maricopa County argues that "[t]he CCSF settlement should be admitted as evidence of bias on the part of Office Depot's expert and to controvert allegations of bias against Maricopa County's expert" and contends that, "[j]ust as in *Hudspeth*, the settlement amount from a prior case can be evidence of a witness's bias in its valuation analyses." (Doc. 165 at 2-4.)

This argument is unavailing. Although Rule 408(b) does allows a court to admit settlement evidence for purposes other than proving/disproving the validity or amount of a disputed claim, "such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution," the CCSF settlement would not be helpful or relevant in proving that Office Depot's expert is biased or in controverting any allegations of bias made against Maricopa County's experts. None of the experts in this case served as experts in the CCSF case. As a result, this case

---

[7] In a separate brief, Maricopa County cites *Broadcort Capital Corp. v. Summa Med. Corp.*, 972 F.2d 1183, 1194 (10th Cir. 1992), for the proposition that "[i]t is relevant . . . that the settlement at issue relates to a claim made by CCSF which was distinct from that made by Maricopa County." (Doc. 188 at 8.) Although the Tenth Circuit's interpretation of Rule 408 is arguably more consistent with the text of Rule 408 than the interpretation contained in *Hudspeth*, the Court must follow Ninth Circuit precedent.

is distinguishable from *Hudspeth*, where "*the same valuation expert* handled the valuation issues" in the prior case that settled and the case before the court, yet "the figures arrived at in the two cases were quite disparate even though the taxpayers in both cases were similarly situated." 914 F.2d at 1214 (emphasis added). The Ninth Circuit found that "[t]he data was relevant to the issue of whether there was bias, especially given the wide disparity between the two figures and should have been admitted by the trial court" for that purpose. *Id.* (footnote omitted). Those circumstances are simply not present here.

Maricopa County's bias theory also lacks merit for a different reason. The implicit premise of this argument is that, because Office Depot ultimately chose to settle with CCSF, the $4.25 million in payments and rebates that were provided by Office Depot as part of that settlement constitute proof that CCSF's claims must have been meritorious (and that Office Depot's expert therefore should have included those payments and rebates in his pricing analysis in this case and exhibited bias by failing to do so). But the whole point of Rule 408 is that "furnishing . . . valuable consideration in compromising or attempting to compromise the claim" is "not admissible . . . to prove or disprove the validity or amount of a disputed claim." Accordingly, the Court agrees with Office Depot that, under Rule 408, evidence of the CCSF settlement and related settlement discussions is inadmissible.

One final point of clarification is necessary before turning to Office Depot's other arguments. As noted, the motion in limine at Doc. 158 seeks to preclude the admission of two different categories of evidence: (1) evidence and argument concerning the CCSF *settlement*, and (2) evidence and argument concerning the CCSF *audit* that preceded, and ultimately helped lead to, the CCSF settlement, as well as evidence and argument concerning Maricopa County's own audit. For the reasons stated above, the Court concludes that Rule 408 prohibits the introduction of evidence falling in the former category (settlement-related evidence). In contrast, Rule 408 does not prohibit the introduction of evidence falling into the latter category (audit-related evidence). This is because the CCSF and Maricopa County audits are neither evidence of "offering . . . or accepting . . . consideration in compromising or attempting to compromise the claim" or

"conduct or a statement made during compromise negotiations about the claim." Fed. R. Evid. 408(a). Office Depot cites *Affiliated Manufacturers, Inc. v. Aluminum Co. of America*, 56 F.3d 521, 530 (3d Cir. 1995), for the proposition that "[b]oth internal and external documents fall within Rule 408's bar when 'intended to assist in calculation of compromise figures discussed subsequently.'" (Doc. 158 at 2.) This case is not binding, and, in any event, it is inapposite—Office Depot has not shown that the audits were intended to assist in the calculation of compromise figures. Thus, if Office Depot wishes to exclude any audit-related evidence, it must identify some reason other than Rule 408.

### 2. Hearsay

Office Depot argues the audits "are inadmissible hearsay not subject to any exception." (Doc. 158 at 3-4.) In response, Maricopa County contends "[t]he audits constitute public records of regularly conducted activity" and are thus admissible under Rule 803(8). (Doc. 165 at 4.)

Under Rule 803(8), "[a] record or statement of a public office" is not excluded as hearsay if (1) "it sets out: (i) the office's activities; (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation" and (2) "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8).

Office Depot argues that the CCSF and Maricopa County audits lack trustworthiness because they were "prepared with an eye to litigation" and "[t]here was no hearing for either audit." (Doc. 158 at 3-4.) The Court agrees. *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254 (9th Cir. 1984), cited by Office Depot, is instructive. There, after suspecting noncompliance, the plaintiffs engaged an auditor "to determine the extent of the [defendants'] compliance with the collective bargaining agreements." *Id.* at 1256-57. The Ninth Circuit found that, even assuming the audit reports were business records under Rule 803(6), because "the [plaintiffs] employed [the auditor] only after they suspected that the

[defendant's] contributions were deficient," the audits were therefore "prepared in anticipation of litigation," which "preclude[d] their admission." *Id.* at 1258-59. The court noted that "[a] document prepared for purposes of litigation is not a business record because it is lacking in trustworthiness . . . because where the only function that the report serves is to assist in litigation or its preparation, many of the normal checks upon the accuracy of business records are not operative." *Id.* at 1259 (citations and internal quotation marks omitted).

The audits here are similarly untrustworthy for purposes of Rule 803(8) because they were prepared in anticipation of litigation. *See, e.g., Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 778 (9th Cir. 2010) (one relevant factor in determining the trustworthiness of a public record is "possible bias when reports are prepared with a view to possible litigation") (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 n.11 (1988)); *United States v. Stone*, 604 F.2d 922, 925 (5th Cir. 1979) (Rule 803(8) "is designed to allow admission of official records and reports prepared by an agency or government office for purposes independent of specific litigation"). After the preliminary CCSF audit, the auditors were to "talk to the City Attorney to determine whether the City would consider litigation or settlement" (Doc. 158-1 at 10), and the City Attorney was thereafter involved in the audit (*id.* at 44, 68-69, 85-86). With respect to the Maricopa County audit, after learning of other municipalities' audits of Office Depot, the head of Maricopa County's Internal Audit Department sent an email asking, "Did we ever make a determination about Office Depot overcharging the County? Seems like a great place for a large recovery given our volume." (Doc. 158-2 at 16.) Thus, even though it may be true (as Maricopa County argued during the hearing) that "[t]he very purpose of these departments is to regularly conduct audits internally of contracts that the respective clients [CCSF and Maricopa County] are party to" and that these departments utilize "generally accepted government auditing standards that are promulgated by the American institute of CPAs," these general observations fail to take into account that the two specific audits at issue in this case weren't prepared in the regular course of business—instead, both were

1 | prepared in anticipation of litigation, casting doubt on their trustworthiness.

2 | During the hearing, Maricopa County also argued for the first time that, even if the

3 | audits aren't admissible under Rule 803(8), it should be able to introduce them under Rule

4 | 703. This argument is unavailing. Although it is permissible, under Rule 703, for experts

5 | to rely on otherwise-inadmissible facts and data,[8] Dr. Strombom admitted during his

6 | deposition that he didn't base any of his opinions on the CCSF or Maricopa County audits.

7 | (Doc. 158-2 at 63-65.) Accordingly, the CCSF and Maricopa County audits are

8 | inadmissible hearsay. This holding does not, however, preclude the admission of argument

9 | and evidence related to the audits—it only encompasses the audit documents themselves.

10 | C. Prejudice

11 | Office Depot argues that, to the extent any of this "evidence"[9] is admissible, "it

12 | should be excluded given the substantial and unnecessary risk of unfair prejudice and jury

13 | confusion" because (1) it "could lead the jury to believe that key contract interpretation

14 | issues have already been decided, and to substitute the opinions of interested lawyers and

15 | auditors for their own on those issues" and (2) "Maricopa's damages expert intends to offer

16 | a separate analysis from that in the audits and did not rely on the audits or the CCSF

17 | settlement in forming his opinions." (Doc. 158 at 4.)

18 | The Court does not see a potential for "substantial and unnecessary risk of unfair

19 | prejudice and jury confusion" and thus will not categorically exclude, under Rule 403, any

20 | evidence or argument related to the CCSF or Maricopa County audits. The Court

21 | envisions, for example, that a witness might refer generally to the fact that CCSF and/or

22 | Maricopa County *conducted* an audit, because the existence of the audit might be helpful

23 |

24 | [8] Rule 703 provides: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field

25 | would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would

26 | otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs

27 | their prejudicial effect."

28 | [9] Although some of the argument in this section seems to pertain only to documents, the Court assumes Office Depot is referring both to the settlement and audit documents themselves as well as to testimony and argument regarding the settlement and audits.

in providing the background and chronology that led to the current litigation. Such a reference would not be prohibited by Rule 403. The Court emphasizes, however, that it is not giving Maricopa County *carte blanche* to discuss the contents of the audits at trial. Instead, the Court is simply denying Office Depot's motion in limine concerning the existence of the audits (as opposed to the contents of the audits) because a general reference to the audits would not be prohibited by Rule 403, Rule 408, or the hearsay rules (the three specific grounds for exclusion raised in Office Depot's motion).

E. **Office Depot's motion to exclude evidence/argument that contravenes the text of the CCSF contract (Doc. 159)**

As noted, Maricopa County intends to argue that Office Depot breached the Pricing Commitment by not charging it the prices Office Depot should have been charging CCSF under the CCSF contract. To determine those prices, the jury will have to interpret the CCSF contract. Office Depot anticipates that Maricopa County "intends to argue that the CCSF Contract reached far beyond its actual scope" and therefore requests that the Court "exclude[e] evidence and argument that contravenes the unambiguous text of the [CCSF] contract." (Doc. 159 at 2.)

As will be discussed further below, the CCSF contract identified various categories of products subject to different pricing and discounts. Both parties agree that Section A pricing covered a discrete set of 591 products and Section B pricing covered a larger, but also discrete, set of roughly 12,000 products that were further categorized into 16 categories, with each category being subject to a different discount. (Doc. 166 at 2.) The parties, however, disagree on the pricing for products not specifically enumerated in either Section A or B. Maricopa County contends all products not enumerated in Section A or B were nonetheless subject to the Section B product category discounts. Doc. 166 at 2 ["[T]he CCSF contract prohibited Office Depot from selling products to CCSF outside the structure of the Section A/B pricing and because Office Depot did in fact sell other products to CCSF, they were contractually obligated to do so at prices within the discount percentage structure set forth in Section B"].) Office Depot disagrees and contends those products

were not subject to the Section B product category discounts. (Doc. 159 at 1-2 ["The CCSF Contract did not require that every purchase CCSF might ever make be placed into Section A or B"—"[t]he plain language of the CCSF Contract demonstrates that both parties anticipated and agreed that CCSF also might purchase items that were not part of the Contract—*i.e.,* not covered by the Section A/B pricing structure."].)

In support of its position, Office Depot cites Section 51 of the RFP, which had been incorporated into the CCSF contract, which required the vendor awarded the contract (*i.e.,* Office Depot) to furnish various annual reports about the items ordered by CCSF, including one "for the total of all items ordered by City which are not part of this contract." (Doc. 159-1 at 5 § 51.) Office Depot further cites its response to a later RFP provision regarding the annual reports, in which it indicated it would "furnish a . . . report for the total of all items ordered by the City which are not part of this contract." (*Id.* at 6-9 § 68(K).) According to Office Depot, "[i]f CCSF and Office Depot intended to cram every potential purchase into Section A or B, then this language would be meaningless, in violation of basic contract interpretation rules." (Doc. 159 at 2.)

Maricopa County cites two different provisions in support of its position. First, Maricopa County cites Section 21, which provides in relevant part as follows:

> [T]he City and its employees and officers are not authorized to request Contractor to perform services or to provide materials, equipment and supplies that would result in Contractor performing services or providing materials, equipment and supplies that are beyond the scope of the services, materials, equipment and supplies agreed upon in the contract unless the agreement is amended in writing and approved as required by law to authorize the additional services, materials, equipment or supplies.

(Doc. 166-1 at 4 § 21(b).) Second, Maricopa County cites Section 78, which provides:

> The Contractor shall have a system that is capable of restricting items not authorized under this contract. Examples of some restrictions are: furniture, janitorial supplies, computers and computer peripheral, copies and copier supplies (all are covered under other contracts) unit values of over $250.00 per unit will also be restricted from purchase.

(Doc. 166-1 at 5 § 78.)

Maricopa County does not dispute Office Depot's contention that "California law governs the CCSF contract." (Doc. 159 at 1 n.1, citing 159-1 at 4 § 15 [choice of law

provision stating that "[t]his contract . . . shall be construed in accordance with the laws of[] the State of California"].) And as noted, under California law, where a contract is ambiguous, extrinsic evidence is admissible. *Wolf*, 8 Cal. Rptr. 3d at 656. But extrinsic "evidence is admissible only to prove a meaning to which the language is 'reasonably susceptible,' not to flatly contradict the express terms of the agreement." *Winet v. Price*, 6 Cal. Rptr. 2d 554, 558 (Cal. Ct. App. 1992).

The Court finds that the CCSF contract is ambiguous and that the language is reasonably susceptible to both parties' asserted interpretations. Notably, neither party identifies any contract provisions explicitly addressing whether products not enumerated in Section A or B should still be subject to discounts. Instead, both parties merely cite provisions that can be read as suggesting certain conclusions on that topic. For example, Office Depot is correct that the inclusion of a provision regarding reporting of purchases made outside the contract tends to suggest that such purchases would not be subject to the pricing categories in the contract. On the other hand, Maricopa County is correct that the provisions stating that purchases cannot be made outside the contract tend to suggest that all purchases must therefore be subject to the pricing categories in the contract.

At bottom, Office Depot's request for exclusion relies on its contention that the contract is unambiguous: "[A]ny extrinsic evidence offered to prove that items not part of the CCSF Contract were nevertheless intended to receive Section A/B pricing 'flatly contradicts the express terms of the agreement' and therefore should be declared inadmissible." (Doc. 159 at 3, quoting *Winet*, 6 Cal. Rptr. 2d at 558, emphasis omitted). Because the Court disagrees and finds that the CCSF contract is ambiguous, and that the language is reasonably susceptible to Maricopa County's asserted interpretation, the Court will allow Maricopa County to introduce extrinsic evidence supporting that interpretation. Accordingly, Office Depot's motion is denied.[10]

　　　…

---

[10]　　This is the same conclusion that was set forth in the Court's tentative ruling, and Office Depot declined to the opportunity to provide further argument on this issue during the hearing.

F. **Office Depot's motion to exclude evidence/argument re: previously dismissed claims (Doc. 160)**

Office Depot moves to exclude any evidence and argument that relate only to claims and theories that have been dismissed, which "includes argument that Office Depot breached the Master Agreement, had a direct contractual (or quasicontractual) relationship with Maricopa; or defrauded, deceived, misled, lied to, or misrepresented or concealed facts from Maricopa, or similar lines of fraud-based commentary." (Doc. 160.) Maricopa County responds that it "does not oppose this motion," but seeks to clarify that, in addition to its breach of contract claim, its claim for breach of the implied covenant of good faith and fair dealing remains viable. (Doc. 167.)

Because it is unopposed, the Court will grant the motion and hold that Maricopa County may only introduce evidence relevant to its claims for (1) breach of contract and (2) breach of the implied covenant of good faith and fair dealing in connection with the Pricing Commitment in the Administration Agreement. With that said, it is unclear whether granting this motion will provide much practical assistance or clarity at trial. At bottom, Office Depot wants to prevent Maricopa County from asserting any fraud-related arguments at trial because all of Maricopa County's fraud-based claims have been dismissed. Yet Maricopa County believes that, to prove its implied-covenant claim, it has a legitimate reason to address certain subjects and conduct that also undergirded its now-dismissed fraud claims. Thus, to the extent Office Depot believes any argument at trial by Maricopa County is straying away from the implied-duty claim and is instead impermissibly seeking to advance a fraud theory, Office Depot may raise an objection. It is impossible at this juncture, however, to provide the parties with precise guidance on where the line might fall.

G. **Office Depot's motion to exclude evidence/argument re: other bad acts, including other lawsuits, investigations, or settlements (Doc. 161)**

Office Depot moves to exclude "any evidence and argument that references other lawsuits, investigations, or settlements involving Office Depot, including but not limited

to (1) allegations regarding the U.S. Communities program made by government entities or David Sherwin and Office Depot's competitors (including the Sherwin litigation and settlement); (2) investigations by or settlements with the federal government or various states, such as California, Colorado, Florida, Georgia, Missouri, Nebraska, and North Carolina; (3) investigations by or settlements with other public entities, including Detroit Public Schools, Dallas County, the cities of Houston, Dallas, or Berkeley, or public entities in Florida; and (4) other allegations unrelated to the U.S. Communities program." (Doc. 161 at 1, footnote omitted.) Maricopa County responds that it "does not oppose this motion provided that this ruling is enforced bilaterally as to both the plaintiff and the defendant." (Doc. 168 at 1.)

During the hearing, Office Depot argued that Maricopa County's seemingly benign request for "bilateral enforcement" would actually result in the preclusion of some of Office Depot's key evidence—communications between U.S. Communities representatives and Office Depot representatives concerning the meaning of the Pricing Commitment. In response, Maricopa County agreed that it was seeking to exclude such communications and argued that, because they "arose" from disputes between Office Depot and various third parties, they should be excluded.

Office Depot's motion will be granted in part and denied in part. It will be granted with respect to the first three categories of evidence specified in the motion. As Office Depot correctly argues (and as Maricopa County doesn't dispute), such topics are inadmissible under Rules 401, 403, 404(b), 408, and/or 802. In contrast, the motion will be denied without prejudice with respect to the fourth category of evidence specified therein ("other allegations unrelated to the U.S. Communities program"), and the Court will also deny without prejudice Maricopa County's request for "bilateral enforcement." These requests will be denied because it became apparent, during the hearing, that the parties have very different views about which evidence would remain in play (and which evidence would be excluded) if these requests were granted.

In sum, the Court is issuing a narrow exclusion order that prohibits Maricopa

County from introducing evidence that Office Depot was investigated, sued, or otherwise subjected to allegations of misconduct by certain third parties. It is, of course, possible that Office Depot may open the door to the introduction of such evidence through its conduct at trial—by, for example, introducing communications between U.S. Communities representatives and Office Depot representatives that contain references to third-party lawsuits and allegations. But deciding whether the door has been opened (and if so, how far) is a determination best left for trial, when it can be evaluated in the context of the precise evidence that has been offered and admitted.

III.     Motions to Preclude Expert Testimony

    A.     **Background**

As noted above, the CCSF contract identified certain categories of products that were subject to different pricing and discounts. Both parties agree that Section A pricing covered a discrete set of 591 products and Section B covered a larger, but also discrete, set of roughly 12,000 products that were further placed into 16 categories, with each category being subject to a different discount. A document called a "net pricer" was incorporated into the CCSF contract, which categorized the roughly 12,000 items that were expressly included in Section B for purposes of determining the applicable discount. (Doc. 172 at 3; Doc. 172-1 at 207, 218-50.) The parties, however, disagree on the pricing for products not specifically enumerated in either Section A or B. Maricopa County contends all products not enumerated in Section A or B were nonetheless subject to the Section B product category discounts. Office Depot contends those products were not subject to the Section B product category discounts and should have been priced "*ad hoc*," as they were. (Doc. 176 at 2-3 ["Sometimes a CCSF employee would negotiate a specific price or discount with an Office Depot representative; sometimes Office Depot would, as a courtesy, apply a small discount to the item (on the order of 5% to 20% off the manufacturer's list price); and sometimes (because of the nature of the item), no discount would be available."].)

As further noted above, Maricopa County's liability and damages theories rest on the contention that Office Depot breached the CCSF contract and, had Office Depot not

breached that contract, the resulting prices would have been lower than the actual prices CCSF ultimately paid. Both parties, thus, retained experts to help them determine those prices.

Maricopa County retained Kent Ratliff and Bruce Strombom, Ph.D. Ratliff was retained to analyze 11,580 items that had not been expressly categorized under Sections A or B of the CCSF Contract and identify which of the 16 categories within Section B each of those items should have been categorized. (Doc. 172-1 at 290-91; Doc. 177-1 at 4.) Dr. Strombom was retained to calculate Maricopa County's damages by determining the price that should have been charged for the products Maricopa County purchased from Office Depot. (Doc. 172-1 at 263 ¶ 4.) Dr. Strombom's methodology for calculating those hypothetical prices was as follows. First, Dr. Strombom accepted that all items identified in Section A should receive the prices contained in Office Depot's pricing data. (*Id.* at 276-77 ¶ 36-38.) Second, Dr. Strombom relied on Ratliff's opinions to determine the discount categories for the products that had not been categorized under Sections A or B. (*Id.* at 279-80 ¶ 44.) Third, for products expressly identified in Section B, Dr. Strombom recalculated the correct prices using certain assumptions, leading him to arrive at different prices than what CCSF had actually been charged for those products. (*Id.* at 280-82 ¶¶ 45-50.)

Office Depot retained Patrick D. Krivoshia to rebut the damages analyses and calculations in Dr. Strombom's report. (Doc. 171-1 at 4-5 ¶ 3.) For the items expressly included under Sections A and B, Krivoshia applied the "associated" Section A or Section B prices. (*Id.* at 17 ¶ 25(a)-(b).) For the 11,580 items that had not been expressly identified in Sections A or B, Krivoshia stated in his report that he priced each item "using the same discount that CCSF received." (*Id.* at 17 ¶ 25(c).) A footnote clarifies that this calculation relied on "wholesale and off-catalog discounts that were in place for three CCSF-affiliated accounts" and "[p]rior to February 13, 2007, [he] assume[d] wholesale and off-catalog items would receive a 20% discount off of list price and that cost floors would not have been imposed" and after that date he "assume[d] wholesale and off-catalog items would

1 receive a 5% discount off of list price" and that cost floors were imposed. (*Id.* at 17 n.47.)

2 Krivoshia conducted two separate comparisons, one which excluded the items not

3 expressly included under Sections A and B and one which applied the pricing discussed in

4 the footnote. (*Id.* at 18 ¶ 27.)

5      B.    **Legal Standard**

6      Federal Rule of Evidence 702 governs the admissibility of expert testimony. "The

7 party offering expert testimony has the burden of establishing its admissibility." *Bldg.*

8 *Indus. Ass'n of Washington v. Washington State Bldg. Code Council*, 683 F.3d 1144, 1154

9 (9th Cir. 2012). As a threshold matter, an expert witness must be qualified "by knowledge,

10 skill, experience, training, or education," Fed. R. Evid. 702, but "Rule 702 'contemplates

11 a broad conception of expert qualifications,'" *Hangarter v. Provident Life & Acc. Ins. Co.*,

12 373 F.3d 998, 1015 (9th Cir. 2004) (citation and emphasis omitted).

13      Under Rule 702, a qualified expert may testify if: "(a) the expert's scientific,

14 technical, or other specialized knowledge will help the trier of fact to understand the

15 evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or

16 data; (c) the testimony is the product of reliable principles and methods; and (d) the expert

17 has reliably applied the principles and methods to the facts of the case." The Federal Rules

18 of Evidence obligate trial courts to "ensure that any and all scientific testimony or evidence

19 admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S.

20 579, 589 (1993).

21      Rule 702(a) "goes primarily to relevance" and "requires a valid scientific connection

22 to the pertinent inquiry as a precondition to admissibility." *Daubert,* 509 U.S. at 591-92.

23 With respect to reliability, "the test under *Daubert* is not the correctness of the expert's

24 conclusions but the soundness of his methodology." *Primiano v. Cook*, 598 F.3d 558, 564

25 (9th Cir. 2010), *as amended* (Apr. 27, 2010) (citation omitted). To "assess the reasoning

26 or methodology," courts should consider "such criteria as testability, publication in peer

27 reviewed literature, and general acceptance, but the inquiry is a flexible one." *Id.* Courts

28 should not exclude an expert's opinion merely because it is "shaky," because such evidence

may "be attacked by cross examination, contrary evidence, and attention to the burden of proof." *Id. See also* Fed. R. Evid. 702, advisory committee note to 2000 amendments ("[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness.") (citation and internal quotation marks omitted).

### C.  Maricopa County's Motion to Preclude Krivoshia (Doc. 171)

Maricopa County moves to preclude Krivoshia "from testifying to any opinions at the trial" on the grounds that his "opinions are (1) not 'based upon sufficient facts to data' and . . . (2) not 'the product of reliable principles and methods' and therefore violate the first two prongs of Rule 702." (Doc. 171 at 1.)  Maricopa County further contends that, "since [Krivoshia's] opinions do not meet the first two requirements of Rule 702, [he] cannot satisfy the Rule's third prong, that he 'apply the principles and methods reliably to the facts of the case.'" (*Id.*)  Specifically, Maricopa County takes issue with how Krivoshia priced the items not listed in Sections A or B, contending that Krivoshia's assumptions in applying across-the-board discounts of 20% and then 5% "ha[ve] no basis in reality." (*Id.* at 6.)  Maricopa County's motion is based on its contention that "[t]here is no testimony or evidence of any description in this case that CCSF actually paid list price less 20% for 'non-contract' goods prior to February 13, 2007, or at any point during the CCSF contract" and "similarly no testimony or evidence of any description in this case that CCSF actually paid list price less 5% for 'non-contract' goods subsequent to February 13, 2007, or at any point during the CCSF contract." (*Id.* at 6.)

In its response, Office Depot argues that the discounts applied by Krivoshia "are drawn directly from the CCSF pricing data (as specifically explained by Krivoshia in the precise footnote attacked by Maricopa) and, as such, are sufficiently supported by record evidence." (Doc. 176 at 14.)  Office Depot further contends that "the record reflects that CCSF paid list price less 20% for a host of non-contract items, including items that

Maricopa also subsequently purchased." (*Id.*) In support, Office Depot cites a spreadsheet entitled "Q3 2005 Usage Non Contract," which seems to indicate the discounts applied to various products designated "Non Contract." (Doc. 176-1 at 31-61; Doc. 176 at 15 [explaining that the spreadsheet "identified each non-contract item purchased by CCSF and, for each, showed the list price as well as the discount applied to that list price to calculate the final price charged (identified as the 'unit price')"].)

In its reply, Maricopa County argues that "Office Depot's Response is mysteriously silent on the evidence relied upon by Mr. Krivoshia to support the 5% discount" and that "Office Depot neither attaches nor cites to any evidence from 2007 or later to justify the use of the 5% fixed discount to goods purchased after February 13, 2007. This represents a tacit acknowledgement that there is no evidentiary basis for the fixed discount of 5% during this period." (Doc. 188 at 3, emphasis omitted.)

Maricopa County's motion to preclude Krivoshia will be denied. As an initial matter, it should be noted that the pricing data Office Depot actually submitted as an attachment to its response brief—the "Q3 2005 Usage Non Contract" spreadsheet—does not provide an adequate foundation for Krivoshia's decision to apply an across-the-board 20% discount to purchases before February 13, 2007 and an across-the-board 5% discount to purchases after that date. Indeed, the Court was under the misimpression, at the time it issued its tentative decision, that Office Depot was proffering that spreadsheet as the primary foundation for Krivoshia's opinion and thus tentatively concluded, based on that misunderstanding, that Maricopa County's motion should be granted. (Doc. 200 at 32-34.)

During the hearing, Office Depot clarified that a different set of pricing data—a data set referred to as "MC-OD0000009"—actually provided the foundation for Krivoshia's decision to apply the 5% discount. Having re-reviewed Office Depot's response to the motion, the Court agrees this argument was fairly raised by Office Depot, albeit not particularly clearly.[11] Accordingly, the tentative order must be revised.

---

[11]    *See, e.g.,* Doc. 176 at 3-4 ("The pricing data form part of the record evidence in this case. Both Strombom and Krivoshia relied on this evidence, although to varying degrees. . . . Krivoshia used the actual prices Office Depot charged CCSF in his analysis . . . ."); *id.* at 9 ("The second assumption, designated in Krivoshia's report as 'Actual Non-Contract

- 32 -

On the merits, Maricopa County's challenge to Krivoshia implicates Rule 702(b), which provides that an expert opinion must be "based on sufficient facts or data."[12]  The Supreme Court has emphasized that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  *See also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) ("*Joiner* requires an expert to justify a foundational assumption or refute contrary record evidence.").  "[T]rial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable."  *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998).  "Expert testimony should not be admitted when it is speculative, it is not supported by sufficient facts, or the facts of the case contradict or otherwise render the opinion unreasonable."  *United States v. Rushing*, 388 F.3d 1153, 1156 (8th Cir. 2004).

Here, Krivoshia stated in footnote 47 of his report that the MC-OD0000009 data set provided factual support for his decision to apply a 20% discount to purchases before February 13, 2007 and a 5% discount to purchases after that date.  (Doc. 171-1 at 17.)  Additionally, Krivoshia identified, in the appendix of his report, the MC-OD0000009 data set as one of the documents on which he relied.  (Doc. 171-1 at 26.)  These references suggest Krivoshia wasn't simply making up the 5% and 20% figures, which is what *Joiner* prohibits, and instead was grounding his opinions in historical pricing data.

The Court does find it odd that Office Depot failed to submit the actual MC-OD0000009 data set in support of its response brief and instead chose to submit a different

Discounts,' uses standardized non-contract discounts found in the CCSF pricing data."); *id.* at 14 ("These non-contract discounts are drawn directly from the CCSF pricing data (as specifically explained by Krivoshia in the precise footnote attacked by Maricopa) and, as such, are sufficiently supported by record evidence.").

[12]  Maricopa County purports to be challenging Krivoshia's methodology and his application of that methodology, but the motion is ultimately challenging the sufficiency of the facts and data on which Krivoshia relied.

piece of evidence (the "Q3 2005 Usage Non Contract" spreadsheet, which, as noted in the tentative order, is flawed).[13] But Maricopa County also declined to submit the MC-OD0000009 data set. Thus, the Court is left to decide whether there are "sufficient facts or data" to support an expert's opinions where (1) the expert contends, in his report, that he relied on a particular data set, (2) the party opposing the expert asserts, but doesn't attempt to prove, that the data set doesn't actually support the expert's opinions, and (3) the party proffering the expert responds by asserting—but, again, not proving—that the data set does, in fact, support the expert's opinions.

Although the ultimate burden of demonstrating the admissibility of an expert's testimony falls onto the proponent, *Bldg. Indus. Ass'n of Washington*, 683 F.3d at 1154, here Krivoshia asserted in his report that a particular data set provides the factual foundation for his opinions and Maricopa County hasn't shown this assertion is inaccurate. Exclusion is not warranted under these circumstances. *Cf. Marsteller v. MD Helicopter Inc.*, 2018 WL 3023284, *2 (D. Ariz. 2018) ("The challenges to Equals' opinions and the weaknesses in his assumptions are issues to be explored on cross-examination."); *Flying Fish Bikes, Inc. v. Giant Bicycle, Inc.*, 2014 WL 12621218, *1 (M.D. Fla. 2014) (drawing a distinction between "an expert's unquestioned ability to render an opinion based on assumed facts and an opposing party's ability to factually disprove the expert's factual assumptions" and emphasizing that "[t]he prospect that the opposition might disprove assumed facts . . . presents no barrier to the admissibility of an expert's opinion").

Finally, it should also be noted that, during the hearing, Maricopa County seemed to argue that Krivoshia's error flowed from his decision to rely on the MC-OD0000009 data set at all (which is different from the argument that the MC-OD0000009 data set fails, as a factual matter, to support the use of the 5% and 20% discounts). Specifically, Maricopa County's main argument seemed to be that the data set was irrelevant to Krivoshia's analysis because Krivoshia was only testifying about the actual prices CCSF

---

[13] Office Depot stated during the hearing that it didn't submit the MC-OD0000009 data set because of its massive size, but Office Depot didn't make any such contention in its response brief.

paid under its contract with Office Depot. This argument is mistaken. Krivoshia stated in his report that he was retained "to analyze and respond to the damages calculations and other analyses in [Dr. Strombom's report]. Specifically, [he was] asked to develop independent opinions related to the extent to which Maricopa County . . . may have been overcharged for purchases of office products and other goods . . . ." (Doc. 171-1 at 4-5 ¶ 3.) Thus, Krivoshia never purported to be opining solely on what CCSF actually paid under the contract.

### D. Office Depot's Motion to Preclude Ratliff and Dr. Strombom (Doc. 172)

Ratliff was retained to analyze 11,580 items that had not been expressly categorized under Sections A or B of the CCSF Contract and identify which of the 16 categories within Section B of the CCSF Contract each of those items should have been categorized. (Doc. 172-1 at 290-91.)

Office Depot moves to exclude Ratliff's testimony on four grounds: (1) "[a]lthough Ratliff worked in the office products industry, he has no experience in the area that matters for his opinions: categorizing products"; (2) his opinions were not "the result of a reliable methodology"; (3) his opinions "fail *Daubert*'s relevance or 'fit' requirement because they are untethered from the facts of the case"; and (4) Maricopa County violated Rule 37 "by producing only an expurgated version that stripped out Ratliff's notes . . . reflect[ing] his reservations regarding the reliability of his opinions as to various items he categorized." (Doc. 172 at 5-17.)

#### 1. Qualification

Office Depot argues Ratliff was unqualified to render opinions in this case because "[a]lthough [he] worked in the office products industry for years, he never performed the task that he was hired to do here: assign office products to categories, either in general or for a specific contract (including the CCSF Contract). Instead, Ratliff's industry experience involved creating catalogs, incorporating categories already assigned to

products by the vendor and wholesaler." (Doc. 172 at 7, emphasis omitted.)[14]

As noted, an expert witness must be qualified "by knowledge, skill, experience, training, or education," Fed. R. Evid. 702, but "Rule 702 'contemplates a broad conception of expert qualifications.'" *Hangarter*, 373 F.3d at 1015 (citation and emphasis omitted). "A witness's knowledge of a general professional field may qualify him or her to testify about a specific practice within that field." *11333 Inc. v. Certain Underwriters at Lloyd's, London*, 261 F. Supp. 3d 1003, 1015 (D. Ariz. 2017). "The touchstone 'is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" *Id.* at 1027 (citation omitted). "[L]ack of particularized expertise goes to the weight accorded [an expert's] testimony, not to the admissibility of her opinion as an expert." *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993).

Ratliff was sufficiently qualified to perform the task he was retained to perform here—categorize office products. Ratliff had substantial experience as a purchaser of office supply products and as a producer of office supply product catalogs. (Doc. 172-1 at 289-90.) From 1996 to 2011, he worked as Catalog Merchandising Manager and Vendor Contract Negotiator for Independent Stationers, where he "buil[t] and proof[ed] a twenty-five thousand item catalog once a year and two twelve thousand catalogs twice a year." (*Id.* at 289.) Ratliff explained in his deposition that he "personally proofed every page of all the catalogs that [the company] produced. Every line. Every category. Everything every year." (Doc. 177-1 at 71-72.) He further testified in his deposition that he was familiar with the 16 categories from the CCSF contract: "Every catalog I have ever built, every dealer that I brought up . . . , we are all using the same [16 categories]. It is an industry standard." (*Id.* at 114-15.) Thus, although Ratliff had not personally performed any categorizing in practice, he was sufficiently familiar with the categories from his

---

[14]     Office Depot also argues Ratliff is unqualified because he "has no experience at all with Office Depot or CCSF, including the principles they used in categorizing Section B products under their Contract." (Doc. 172 at 7.) This argument will be addressed below in the context of Office Depot's relevance objection.

experience to categorize the products here.

The cases Office Depot cites are inapposite. In those cases, the expert lacked experience with the specific subject matter at issue. *Certain Underwriters at Lloyds, London v. Inlet Fisheries, Inc.*, 389 F. Supp. 2d 1145, 1154 (D. Alaska 2005) (expert with "many years of experience in the insurance business" but only "minimal" and "sporadic" experience "with respect to underwriting marine pollution policies" was "not qualified to testify as an expert on underwriting marine pollution insurance policies"); *Biscayne Towing & Salvage v. M/Y BACKSTAGE*, 2014 WL 1389030, *3 (S.D. Fla. 2014) (excluding expert because, although he "ha[d] experience in salvage," he "lack[ed] the experience regarding salvage involving marina fires to be qualified as an expert"); *Reid v. Albemarle Corp.*, 207 F. Supp. 2d 499, 501 (M.D. La. 2001) (excluding expert where "[a]ll of his publications [were] in different fields using different methodology from that required in th[e] case" and "[w]hile it is possible that [expert] ha[d] had sufficient 'on-the-job' training in his court related work, he ha[d] not produced sufficient information about that work to demonstrate his knowledge of statistical science in th[e] case"). Office Depot cannot contend Ratliff lacked experience with the categorization of office products.

2.      Methodology

Office Depot next argues that Ratliff's opinions "rest on no methodology." (Doc. 172 at 8.) Office Depot further contends "[t]he lack of any discernable methodology is reflected in the inconsistent, and therefore unreliable, opinions Ratliff offers." (*Id.* at 9.)

As an initial matter, it is important to note that Ratliff didn't rely on any scientific methods or written guidelines when deciding how to categorize particular office products. Instead, he relied on the experience and knowledge he derived from working in the industry, including his knowledge of unwritten industry standards:

Q.      So are you saying that you took your familiarity with categorizations used by manufacturers and wholesalers and applied it to the products that Office Depot sold?

A.      Yes. . . .  And every category I ever put together.

Q.      Can you describe for me the methodology that you used in assigning categories to each individual item?

| | |
|---|---|
| A. | Look at the description. Put it in the . . . category. |
| Q. | What guidelines did you apply? |
| A. | There were not guidelines. I know office products like the back of my own hand. |

\* \* \*

| | |
|---|---|
| Q. | So did you understand your task to be assigning wholesaler standard categories to the products that Office Depot sold to Maricopa County? |
| A. | Yes. Because the wholesaler category list is the bible used by every data system in the country utilizing office products as their main sales point. |
| Q. | So if there was a difference between how Office Dept categorized a product for the San Francisco contract and how a wholesaler categorized the same product, which category would you assign? |
| A. | The wholesaler. United. |
| Q. | Is that how you performed your analysis that we see in [the spreadsheet attachment to your report]? |
| A. | Yes. |

(Doc. 172-1 at 67-68, 70-71.)

On the one hand, Ratliff's reliance on experience does not render his methodology *per se* improper. Rule 702 provides that an expert's testimony must be "the product of reliable principles and methods" and the expert must "reliably appl[y] the principles and methods to the facts of the case." The advisory committee notes to Rule 702 further provide that "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702, adv. comm. note to 2000 amendments (citation omitted). *See also Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data . . . ."). Thus, "it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among

1  140 odors at a sniff, whether his preparation is of a kind that others in the field would

2  recognize as acceptable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). There

3  is, in short, nothing inherently suspect about Ratliff relying on his experience and

4  knowledge of industry standards to provide the methodology for his opinions.

5         On the other hand, the Court is troubled by the terse answer Ratliff provided when

6  asked during his deposition to explain his methodology—he described it as "Look at the

7  description," "Put it in the . . . category." This description comes perilously close to the

8  "just take my word for it" approach that is forbidden by the advisory committee notes to

9  Rule 702. Nevertheless, a fair reading of Ratliff's deposition transcript reveals that,

10 although this particular answer provided an unacceptably sparse description of his

11 methodology, he explained during other portions of his deposition that the "industry

12 standard" is to place all office products into discrete categories, that he is very familiar

13 with these categories and "know[s] office products like the back of [his] own hand," and

14 that he completed his categorization work in this case—*i.e.*, placing 11,580 particular

15 office products that had been purchased by Maricopa County into the 16 categories

16 specified in Section B of the CCSF contract—by using the knowledge and experience he

17 had derived from "thirty years of history and data loads from the industry that I was

18 personally involved with every week." (Doc. 172-1 at 67-70, Doc. 117-1 at 114-15.) This

19 was an adequate description of Ratliff's methodology and undermines Office Depot's

20 contention that he employed no methodology whatsoever.

21        Office Depot also relies on inconsistency as a basis for arguing that Ratliff did not

22 apply a methodology. According to Office Depot, Ratliff's categorizations were both

23 externally inconsistent (*i.e.,* inconsistent with "the way Office Depot and CCSF had agreed

24 to categorize similar items") and internally inconsistent (*i.e.,* inconsistent with his

25 categorization of similar products in his own report). (Doc. 172 at 9-10.)

26        Office Depot's external-inconsistency argument is easily rejected. Although such

27 inconsistency may call into question the *relevance* of Ratliff's opinions—an issue that is

28 addressed below—it does not call into question the *reliability* of his opinions. Indeed,

Ratliff didn't purport to opine on how representatives from Office Depot and CCSF would have categorized the products. Instead, he offered opinions on how the products should have been categorized under standard industry categorization.

Office Depot's argument concerning internal inconsistency presents a closer question. In its motion, and again during the hearing, Office Depot identified an array of errors in Ratliff's report. For example, Ratliff stated at times in his report that stencils should be placed in the category of "Art & Drafting Supplies," yet stated at other times that stencils should be placed in the category of "Specials." (172-1 at 156.) During his deposition, Ratliff admitted that all of the stencils should have been placed in the "Art & Drafting Supplies" category. (*Id.*) Similarly, Ratliff stated at times in his report that labelers should be placed in the category of "Mailing, Packing & Labeling Supplies," yet stated at other times that labelers should be placed in the category of "Technology." (172-1 at 107-09.) During his deposition, Ratliff admitted these were mistakes, too. (*Id.* at 109.) All told, Office Depot identifies 84 items that Ratliff admits he inconsistently categorized in his report (Doc. 172 at 9-10)[15] and contends that, "[w]ith infinite deposition time, Office Depot could have examined Ratliff to confirm many more" (Doc. 189 at 8).

The key question is whether the errors within Ratliff's report merely amount to a handful of innocent mistakes (as Maricopa County contends) or whether they are the inevitable consequence of Ratliff employing a made-up methodology that is incapable of replication (as Office Depot contends). Although the Court is troubled by the errors, which Office Depot dramatically illustrated during the hearing, the Court is not convinced they were so pervasive as to render Ratliff's methodology unreliable as a matter of law. *Daubert*, 509 U.S. at 579 ("Vigorous cross-examination, presentation of contrary evidence,

---

[15]     Maricopa County responds by noting that although "84 SKUs of certain products (crayons, chalk, stickers, stencils, letters, mugs, bulletin or message boards, and step stools) were each placed into more than one category, and Ratliff agreed during his deposition that most of these types of products should have been designated to a single category," "[m]ost of those 84 SKU's were properly characterized, and only a portion of them were not correctly categorized." (Doc. 177 at 12, emphasis omitted.) Thus, Maricopa County argues that "[t]he total universe of errors claimed by Office Depot is thus substantially less than one percent of the 11,580 SKUs which Ratliff categorized." (*Id.*)

and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *City of Pomona*, 750 F.3d at 1048 ("A more measured approach to an expert's adherence to methodological protocol is consistent with the spirit of *Daubert* and the Federal Rules of Evidence: there is a strong emphasis on the role of the fact finder in assessing and weighing the evidence.").  Again, Ratliff was retained to place 11,580 office products into certain product categories.  It is understandable that an expert might make a few errors when completing such a large task, and the actual number of errors identified by Office Depot is relatively low in the overall scheme of things.  Finally, Office Depot's argument that it could have persuaded Ratliff to acknowledge even more errors with "infinite deposition time" overlooks that Ratliff issued his report in February 2016.  (Doc. 172-1 at 1.)  Office Depot, in other words, has had more than three years to inspect Ratliff's report and identify any additional inconsistencies beyond those it chose to raise during Ratliff's deposition.  It would be improper to assume that the report is somehow riddled with a large number of additional unspecified errors that Office Depot hasn't had the time or ability to identify.

### 3.  Relevance

An expert may testify only if his opinions are relevant, that is, if they "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry."  *Primiano*, 598 F.3d at 565 (citation omitted).  "The evidence must logically advance a material aspect of the party's case."  *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

Office Depot contends that "[b]ecause Ratliff's opinions rest on how non-party United categorized products, not how Office Depot and CCSF did, his opinions cannot assist the jury" and "[h]is opinions would instead serve only to mislead the jury by urging jurors to ignore the record evidence in favor of an approach to categorization that the record demonstrates the parties to the CCSF Contract did not use."  (Doc. 172 at 12.)

Maricopa County responds that "Office Depot can only speculate on how the

Maricopa County purchases not named in Sections A and B of the CCSF contract would have been characterized by Office Depot and CCSF. Mr. Ratliff assigned industry standard classifications to each such purchase by Maricopa County. To the extent Office Depot disagrees with Mr. Ratliff's findings, it was free to designate its own rebuttal expert on this issue." (Doc. 117 at 11.)

Although the question of relevance presents a close call, the Court will not exclude Ratliff's opinions on this basis. Ratliff stated in his report that he was "supplied with the 16 categories under the Office Depot contract with [CCSF]" (Doc. 177-1 at 4) and testified during his deposition that it did "not surprise [him] that there would be sixteen categories to place items into" because "[i]t is an industry standard." (Doc 177-1 at 115). Ratliff went on to testify that he relied on his knowledge of, and familiarity with, industry standards when determining how the 11,580 items should have been hypothetically categorized under the 16 categories. (Doc. 172-1 at 67-68.) However, Ratliff also stated that he didn't review the CCSF contract or "any documents showing how Office Depot and [CCSF] agreed to categorize items during the term of the [CCSF] contract" and that "it would not have been important to [him] to know how Office Depot categorized its products for the [CCSF] contract as [he was] preparing [his] report." (Doc. 172-1 at 66-67, 70, 183-84.) Ratliff further testified that, for each of the 16 categories within Section B of the CCSF contract, he expected there would be inconsistencies between the items he assigned to those categories and the items Office Depot assigned to those categories because the CCSF contract categorization was "wrong" in some cases. (*Id.* at 83, 85-87, 94, 141-46.)

Office Depot is correct that the most relevant question in this case is how Office Depot and CCSF actually would have categorized the 11,580 products within Section B of their contract. After all, Maricopa County's damages theory is that it should have received the pricing to which CCSF was entitled. The question that Ratliff chose to address (*i.e.,* how those 11,580 products hypothetically should have been categorized under industry standards) is slightly different. The issue is whether this mismatch renders Ratliff's opinions irrelevant, and therefore inadmissible, under Rule 702.

It doesn't.  Although Ratliff acknowledged a handful of instances where the CCSF contract categorized particular products in a way that deviates from industry standards— for example, the CCSF contract classified soccer balls and footballs as "Arts and Drafting Supplies" (Doc. 172-1 at 146)—Ratliff testified that he didn't believe "those inconsistencies undermine the value of [his] report in any way" because his "intention was to put industry standard categories in after the products and not to try to match what Office Depot put in category one."  (*Id.* at 146-47.)  And as noted above, Ratliff testified that the 16 categories identified in the CCSF contract were consistent with industry standards.  (Doc. 177-1 at 114-15.)[16]  Thus, the Court views Ratliff's analysis as providing a reasonably helpful, if imperfect, proxy for determining the appropriate categorization for Maricopa County's purchases within the CCSF contract framework.  It therefore satisfies Rule 702's relevance standard—it "logically advance[s] a material aspect of" Maricopa County's case, *Cooper*, 510 F.3d at 942, and has "a valid connection to the pertinent inquiry." *Primiano*, 598 F.3d at 565.  To the extent Office Depot believes Ratliff erred by calculating hypothetical prices and that the CCSF contract deviated from industry-standard pricing with respect to particular products, it can bring out those perceived errors through cross-examination.

4.  <u>Rule 37</u>

During his deposition, Ratliff testified there had been an additional column in the spreadsheet he prepared as an attachment to his report, entitled "Notes," which "listed out [his] thinking and questions regarding the items that [he was] categorizing."  (Doc. 172-1

---

[16]    In its Powerpoint presentation during the hearing, Office Depot argued that pages 353-54 of Ratliff's deposition contain an admission by Ratliff that "Office Depot and San Francisco Did Not Follow 'Industry Standards.'"  The Court has carefully reviewed the cited deposition excerpt and does not share this interpretation.  The question posed to Ratliff during this portion of the deposition was whether he would "agree that the way that Office Depot categorized its products [in the CCSF contract], *for example, in Exhibit 8*, is different from the industry standard that you are familiar with."  (Doc. 172-1 at 201-02, emphasis added.)  Ratliff's affirmative answer to this question was ambiguous because it was not clear whether Ratliff was agreeing that the CCSF contract deviated from industry standards in its entirety or whether Ratliff was simply acknowledging that Office Depot's counsel had previously identified a specific instance of a deviation.  In light of Ratliff's other testimony that the CCSF contract utilized a 16-category structure that is consistent with industry standards, the Court views the latter interpretation as more plausible.

at 40.) Ratliff stated "I believe so" when asked whether "that column of notes [was] included on [his] final report." (*Id.* at 187-88.) Ratliff also stated he had reviewed the "Notes" column the night before his deposition "as part of [his] preparation" because he "thought it would come up." (*Id.* at 188.) In fact, the "Notes" column was not included in the final version of the report that was produced to Office Depot and Maricopa County declined to produce the "Notes" column when Office Depot asked for it.

Office Depot argues Ratliff should be precluded from testifying because Maricopa County violated Rule 37 by failing to fully disclose his expert report. (Doc. 172 at 13-15.) According to Office Depot, "Maricopa altered Ratliff's report to remove his caveats and, thereby, deprived Office Depot, the Court, and the jury of access to Ratliff's true opinions." (*Id.* at 15.) Maricopa County responds that the spreadsheet containing the "Notes" column was part of a draft report and was therefore exempt from disclosure under Rule 26(b)(4)(B). (Doc. 177 at 13-14.) Maricopa County further contends "Ratliff's final Report fully states his conclusions and opinions as to how the Maricopa County purchases would be categorized under standard practices in the office product industry. No portion of his report was withheld." (*Id.* at 14.) In its reply, and during the hearing, Office Depot argued that all of the evidence points to the conclusion that Ratliff intended for the version of his report that he sent to Maricopa County's counsel (which included the "Notes" column) to be the final version of his report, the only suggestion to the contrary is an unverified assertion by Maricopa County's counsel, and Maricopa County failed to submit any evidence to corroborate that assertion.

Under Rule 26, an expert report must include "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). If a party violates Rule 26's expert disclosure requirements, the expert to whom the violation pertains cannot testify at trial "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). However, a party is not required to disclose draft reports. Rule 26 protects as work product "drafts of any report or disclosure required under Rule 26(a)(2), regardless of the form in which the draft is recorded." Fed. R. Civ. P.

26(b)(4)(B).  *See generally* S. Gensler, 1 Federal Rules of Civil Procedure, Rules and Commentary, Rule 26, at 755 (2018) ("Effective December 1, 2010, Rule 26(b)(4)(B) was amended to provide work-product protection to drafts of expert reports . . . .  The new rule altered the result followed in most cases that allowed discovery of draft reports."); *id.* at 758 ("What is different now is that the expert can write drafts in private and does not need to testify about her conversations with retaining counsel, subject to a few exceptions.").  A court may order the disclosure of draft expert reports only upon a showing of "substantial need" and "undue hardship."  Fed. R. Civ. P. 26(b)(3)(A).  *See also In re Application of Republic of Ecuador*, 280 F.R.D. 506, 512-13 (N.D. Cal. 2012) ("Draft reports by [the experts], including draft worksheets, are treated as qualified work product, where discovery may be ordered by the court based upon a showing of 'substantial need' for case preparation and that the information cannot, without undue hardship, be obtained by other means.").

The key question here, then, is whether the version of the report that Ratliff sent to Maricopa County's counsel (which included the "Notes" column) was a draft.  On the one hand, Ratliff's testimony during his deposition suggests he believed the Notes-containing version would ultimately be produced to Office Depot.  On the other hand, Maricopa County's counsel has asserted this version was a draft and this assertion is consistent with experience and common sense—final versions of expert reports don't usually contain the expert's incompletely-expressed musings and notations.

The case law, somewhat surprisingly, provides little guidance when it comes to determining whether an expert's report was a draft or final version.  *See, e.g., Salazar v. Ryan*, 2017 WL 2633522, *2 (D. Ariz. 2017) ("The definition of what constitutes a 'draft report' is not evident from the rule itself, and there is little published authority on what is protected from disclosure."); *In re Nat. Hockey League Players' Concussion Injury Litig.*, 2017 WL 684444, *1 (D. Minn. 2017) ("As other courts have acknowledged, there is little published authority on the question of what constitutes a 'draft' that is protected from disclosure.); *Wenk v. O'Reilly*, 2014 WL 1121920, *5 (S.D. Ohio 2014) ("There is not an

abundance of case law which helps the Court distinguish between notes which are simply a compilation of information for possible later use in a case, and notes which truly are part of the draft of a final expert report."). Some of the factors that courts have considered when determining whether documents constitute a draft report include "whether the documents were created for the purpose of being included in the final report, and whether they were actually included in earlier versions of the report." *Salazar*, 2017 WL 2633522 at *2. Courts have also concluded that "[a]n expert's notes setting out in detail the content and structure of her report, or even just a section of her report, could properly be shielded from disclosure by Rule 26(b)(4)(B)." *Deangelis v. Corzine*, 2016 WL 93862, *4 (S.D.N.Y. 2016).

The Court concludes that the version of the Ratliff report which Maricopa County produced to Office Depot constituted a complete statement of the opinions Ratliff will express (and the reasons for those opinions) and that the earlier version, which contained the "Notes" column, was a draft. Although Ratliff may have been under the misimpression his "Notes" column would be produced, Office Depot hasn't identified any authority suggesting this subjective expectation should be dispositive—Ratliff doesn't have much experience as an expert and, as noted above, it would be unusual for a final report to contain this sort of raw information. Most important, Office Depot doesn't challenge the reasoning and explanation provided in the report, other than to argue it should also have also received the version Ratliff originally sent Maricopa County. This bolsters the conclusion that the analysis contained in the final, produced version constituted a complete expression of Ratliff's opinions. *Davita Healthcare Partners, Inc. v. United States*, 128 Fed. Cl. 584, 592 (2016) ("Defendant does not argue that Ms. Ryan's report or her disclosures are somehow insufficient or incomplete, but instead seeks documents containing Ms. Ryan's preliminary analyses of claims data and various damages scenarios, reflecting Plaintiffs' counsel's mental processes in developing litigation strategy, or the iterations of the expert's preliminary analyses communicated to counsel. These preliminary analyses are not discoverable.") (citation omitted); Gensler, *supra*, at 755 n.327 ("The protection for drafts

'regardless of the form' extends to smaller writings made with the purpose of incorporating them into the eventual draft.").

The cases cited by Office Depot are inapposite. One involved a failure to timely disclose an expert report, which is not the issue here. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1105-07 (9th Cir. 2001) (upholding district court's exclusion of expert's testimony where defendants disclosed the expert's report only 28 days before trial and almost two years after the close of discovery). The other two involved woefully insufficient expert disclosures, which again is not the issue here. *Rhodes v. Energy Marine LLC*, 2016 WL 8199310, *7 (D. Ariz. 2016) (excluding expert testimony where expert's report "offer[ed] what largely appear[ed] to be unsubstantiated calculations and predictions," failed to "identify the 'basis and reasons' for his opinions," and failed to provide the exhibits he used and his compensation); *Torgerson v. Leavit*, 2013 WL 12066142, *1 (W.D. Wash. 2013).

For these reasons, the Court will not preclude Ratliff from testifying.

### 5.   Dr. Strombom

Office Depot argues that, because Ratliff's opinions should be excluded, Dr. Strombom's opinions (which "rest[] directly and inextricably on Ratliff's categorization work") must be excluded, too. (Doc. 172 at 15-17.)

Because the Court is not excluding Ratliff's opinions, and Office Depot does not move on any other ground to exclude Dr. Strombom's opinions, the Court will not exclude Dr. Strombom.

\*\*\*

Accordingly, **IT IS ORDERED** that:

(1)    Maricopa County is entitled to a jury trial;

(2)    Maricopa County's motion in limine re: notice of breach (Doc. 155) is **granted**;

(3)    Maricopa County's motion in limine to exclude standards/guidelines applicable to other U.S. Communities contracts (Doc. 156) is **denied**;

(4)     Office Depot's motion in limine to exclude evidence/argument re: claims or damages barred by the statute of limitations (Doc. 157) is **denied without prejudice**;

(5)     Office Depot's motion in limine to exclude evidence/argument re: San Francisco settlement and related audits (Doc. 158) is **granted in part and denied in part**;

(6)     Office Depot's motion in limine to exclude evidence/argument that contravenes the text of the CCSF contract (Doc. 159) is **denied**;

(7)     Office Depot's motion in limine to exclude evidence/argument re: previously dismissed claims (Doc. 160) is **granted**;

(8)     Office Depot's motion in limine to exclude evidence/argument re: other bad acts, including other lawsuits, investigations, or settlements (Doc. 161) is **granted in part and denied in part**;

(9)     Maricopa County's motion to preclude expert testimony of Patrick D. Krivoshia (Doc. 171) is **denied**;

(10)     Office Depot's motion to preclude expert opinions of Kent Ratliff and Dr. Bruce Strombom (Doc. 172) is **denied**; and

(11)     Office Depot may file a motion for summary judgment limited to the issue of the statute of limitations.  Office Depot's motion must be filed by October 23, 2019, Maricopa County's opposition must be filed by November 6, 2019, and Office Depot's reply must be filed by November 13, 2019.

Dated this 9th day of October, 2019.


_____
Dominic W. Lanza
United States District Judge

- 48 -